**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| TALON INDUSTRIES, LLC, d/b/a PROGRESSIVE-RUESCH MACHINE CO., LLC, <br><br> Plaintiff, <br><br> v. <br><br> ROLLED METAL PRODUCTS, INC., <br><br> Defendant. | Civil Action No.: 15-4103 (CCC) <br><br><br> **OPINION** |

**CECCHI, District Judge.**

## I.    <u>INTRODUCTION</u>

This matter comes before the Court on Defendant Rolled Metal Products, Inc.'s ("Defendant" or "Rolled Metal") motion for summary judgment. ECF No. 67. Plaintiff Talon Industries, LLC d/b/a Progressive-Ruesch Machine Company, LLC ("Plaintiff" or "Talon") opposed the motion (ECF No. 69 ("Opp.")), and Defendant replied (ECF No. 70 ("Reply")). The Court decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78(b). For the reasons set forth below, Defendant's motion (ECF No. 67) is granted in part and denied in part.

## II.   <u>BACKGROUND</u>[1]

Plaintiff, Talon Industries LLC d/b/a Progressive-Ruesch Machine Company, LLC is the purported successor company to Progressive Machine Company ("PMC") and Progressive-Ruesch Machine Company, Inc. ("PRMC Inc."). Plaintiff is an engineering firm, which, among other things, is in the business of "manufacturing industrial machinery, including designing, engineering and manufacturing winders, slitters, coilers and tube equipment." Pl. SMF Supp. at ¶ 1. Defendant sells various types of metals in coiled form and offers metal processing services. Def. SMF at ¶ 2. In 2005, PMC contracted with Defendant to design and build a six-strand traverse winding machine unit powered by Plaintiff's proprietary software. Pl. SMF Supp. at ¶ 9. Thereafter, Defendant contracted with a different engineering firm, K&S Machines ("K&S"), to build a second six-strand traverse winder machine unit. Pl. SMF Reply at ¶ 61. Plaintiff contends that during the design and construction of the second six-strand traverse winder machine, Defendant misappropriated Plaintiff's trade secrets and committed various common-law violations for breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, and unfair competition.

### A.   **Corporate History**

PMC, originally founded in 1946, was an engineering firm, which designed and manufactured traverse winders, as well as developed the software necessary for the machines to function. *Id.* at ¶ 7. The Honczarenko family took control of PMC in the 1980s, and, by the mid-2000s, Stephen Honczarenko ("Honczarenko"), Plaintiff's corporate representative in this matter, was serving as the company's Chief Sales Engineer. Pl. SMF. Supp. at ¶ 5.

---

[1] Background facts are taken from the parties' statements of material fact, pursuant to Local Civil Rule 56.1.  *See* ECF Nos. 68-2 ("Def. SMF"), 69-1 ("Pl. SMF Reply"), and 69-2 ("Pl. SMF Supp.").

Around 2002 or 2003, the Honczarenko family formed a second entity, PRMC Inc. Def. SMF at ¶ 11. The entity was formed as a purchasing vehicle to buy another engineering company, Ruesch Machine Company. Pl. SMF Reply at ¶ 11. Ultimately, PRMC Inc. marketed and sold Ruesch Machine Company equipment as part of the PMC family of companies. *Id.*

The parties dispute how PMC and PRMC Inc. eventually became Talon. According to Defendant, in 2007, both PMC and PRMC Inc. were merged into a new entity, Progressive-Ruesch Machine Company, LLC ("PRMC LLC"), and that same year also "ceased to exist." Def. SMF at ¶¶ 9–10, 15. Thereafter, in 2011, PRMC LLC merged into Talon. *Id.* at ¶ 17. By contrast, Plaintiff asserts that PMC and PRMC Inc. did not cease to exist in 2007 but only halted their day-to-day operations, and were merged directly into Talon in 2011. Pl. SMF Reply at ¶¶ 9, 15. Plaintiff claims that Talon and PRMC LLC are the same entity: Talon, a Delaware company, is registered to do business in New Jersey as a foreign entity under the name PRMC LLC. *Id.* at ¶ 17.

### B.      The Machinery

In 2005, PMC provided a proposal (in the form of a quote) to Defendant to design and build a six-strand traverse winder machine unit for Defendant. *Id.* at ¶ 28. These machines take coiled sheet metal, unwind the metal into flat sheets, cut these sheets in various ribbon patterns, and then re-roll the ribbons into new coils. *Id.* at ¶¶ 24–26. Traverse winder systems are well-known pieces of machinery among firms in the industrials and metals industry. *Id.* at ¶ 91. While Defendant reviewed the quote, PMC arranged for Defendant to view a similar machine to the one Plaintiff had proposed to build, which had been purchased and used by another PMC customer. *Id* at ¶ 37. Eventually, Defendant accepted PMC's proposal, and after Defendant agreed to PMC's terms of sale, PMC proceeded to design and build the machine. *Id.* at ¶ 30. PMC delivered the completed unit to Defendant in May 2006. *Id.* at ¶ 39. The parties contest whether the agreement

to build the traverse winder was subject to any confidentiality provision, and they further contest whether the drawings, schematics, and software code associated with the machine were confidential. *See, e.g.*, *id.* at ¶¶ 29, 33, 47–48, 98–99, 103–104.

Around the time Plaintiff completed work on the six-strand traverse winder unit, Defendant ordered an additional single-strand winder machine from Plaintiff. *Id.* at ¶ 50. Defendant contends that PMC never finished this machine, and that it was forced to transport a partially completed winder from Plaintiff's facilities to one of Defendant's warehouses, where Defendant finished it. Def. SMF at ¶¶ 51, 56. Plaintiff disagrees, asserting that PMC built the entire machine at one of Defendant's facilities. Pl. SMF Reply at ¶¶ 51, 56. This disagreement notwithstanding, based on Defendant's experience with the construction of the single-strand winder, it believed PMC was going out of business. Accordingly, when Defendant decided to purchase a second six-strand traverse winder unit to match the first machine built by PMC, it contracted with K&S Machines to do the work. Def. SMF at ¶¶ 52–53, 57–59, 61. In turn, K&S subcontracted with EDC Electronics and Jim Delis, a former PMC subcontractor who worked on PMC's traverse winder machines, to handle the electrical and software coding work necessary for Defendant's new machine to function. Pl. SMF Reply ¶¶ 72, 79. The parties dispute whether Defendant provided K&S with confidential information from the first six-strand traverse winder unit, including Plaintiff's drawings, schematics, and software code. *See e.g.*, *id.* at ¶¶ 66–68, 71. Moreover, the parties dispute whether Defendant was aware of the extent of Jim Delis's previous association with PMC, and whether Defendant knew that Delis would use Plaintiff's purportedly confidential information when working on the second unit's code. *Id.* at ¶¶ 80, 84

K&S installed the second six-strand traverse winder unit in November 2008. *Id.* at ¶ 121. Subsequently, in 2010, Plaintiff discovered that K&S had built the traverse winder unit for

4

Defendant after Plaintiff viewed the new winder on Defendant's website. *Id.* at ¶ 75. Upon viewing Defendant's website, Plaintiff believed that K&S had used its trade secrets to build the machine. *Id.*

### C.    Procedural History

Plaintiff initiated this action on June 17, 2015. ECF No. 1. Defendant filed a motion to dismiss on September 4, 2015 (ECF No. 9), which this Court denied on April 12, 2016 (ECF No. 14). Later, on April 13, 2018, Plaintiff filed an amended complaint, alleging claims for:  breach of contract (Count 1), breach of the covenant of good faith and fair dealing (Count 2), unjust enrichment (Count 3), common law unfair competition (Count 4), violation of the New Jersey Trade Secrets Act (Count 5), and common law trade secret misappropriation (Count 6). ECF No. 57. Defendant answered on April 27, 2018. ECF No. 58. Thereafter, Defendant moved for summary judgment as to all six counts. ECF No. 67. Plaintiff opposed (ECF No. 69), and Defendant replied (ECF No. 70). Defendant's motion for summary judgment was subsequently administratively terminated pending mediation between the parties. ECF No. 76. Mediation was unsuccessful. The Court now decides Defendant's motion for summary judgment.

## III.   <u>LEGAL STANDARD</u>

Summary judgment is appropriate if the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials," demonstrate that there is no genuine issue as to any material fact, and, construing all facts and inferences in a light most favorable to the non-moving party, "the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

The moving party has the initial burden of proving the absence of any genuine issue of material fact. *See Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-moving party has the burden of identifying specific facts to show that, to the contrary, a genuine issue of material fact exists for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986). In order to meet its burden, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citation omitted); *see also Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("To raise a genuine issue of material fact," the opponent must "exceed[] the 'mere scintilla' threshold . . . ."). An issue is "genuine" if it is supported by evidence, such that a reasonable jury could return a verdict in the non-moving party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *See id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

## IV.   DISCUSSION

In its motion for summary judgment, Defendant makes three primary arguments for dismissal. Defendant contends that Counts 1 through 4 are barred by the applicable statutes of limitations. Defendant also avers that Talon lacks standing to assert Count 6, the trade secret misappropriation claim. Defendant further maintains that, even if Talon has standing to assert the trade secret misappropriation claim, such a claim nevertheless fails because: (1) no trade secret

exists; (2) the alleged trade secrets were not communicated from Plaintiff to Defendant in confidence, and were inadequately protected; and (3) Plaintiff failed to demonstrate that Defendant provided Plaintiff's trade secrets to a third party, or that Defendant received the trade secrets with knowledge that someone else had breached a confidentiality agreement with Plaintiff. [2]

The Court finds, as explained below, that:  (A) Counts 1, 2, and 3 are barred by the statutes of limitations, but Count 4 is timely; (B) there is a dispute of fact as to whether Talon has standing to assert the trade secret misappropriation claim; (C) there is a dispute of fact as to whether Talon has established that a trade secret exists; and (D) there is a dispute of fact as to whether Talon has satisfied the remaining elements of a trade secret misappropriation claim.[3]

### A.      Statutes of Limitations

Defendant argues that the claims for breach of contract (Count 1), covenant of good faith and fair dealing (Count 2), unjust enrichment (Count 3), and unfair competition (Count 4) are barred by the applicable statute of limitations, and no tolling doctrine, including New Jersey's discovery rule, applies. ECF No. 68 ("Mot.") at 33–35. The Court discusses the timeliness of each claim at issue in turn below.

### 1.      Breach of Contact

Regarding Plaintiff's breach of contract claim under Count 1, the parties dispute which statute of limitations is applicable and when the claim accrued. Defendant contends that if any breach occurred, it occurred no later than 2008 when K&S delivered the second traverse winder unit allegedly containing Plaintiff's trade secrets to Defendant. Mot. at 33. Defendant further

---

[2] The parties agree that New Jersey law governs these claims. *See generally* Mot.; Opp.

[3] The parties agree that Plaintiff's New Jersey Trade Secrets Act claim (Count 5) should be dismissed because the alleged misappropriation occurred before the statute was enacted, and the statute does not apply retroactively. Mot. at 37; Opp. at 36. Thus, pursuant to the parties' agreement, Count 5 is dismissed.

asserts that the contract is for the purchase of a good (the traverse winder system), despite an acknowledgment that the contract included attendant services such as installation and start-up assistance. *Id.* Plaintiff thus contends that its goods contract claim is subject to a four-year statute of limitations, pursuant to New Jersey Statute Annotated ("N.J.S.A.") § 12A:2-725 (incorporating the Uniform Commercial Code's four-year statute of limitations for goods contracts into New Jersey law). *Id.* Defendant argues that because Plaintiff did not bring its action until 2015 (ECF No. 1), more than four years elapsed from the alleged contractual breach, and accordingly, Plaintiff's breach of contract claim is untimely. *Id.* By contrast, Plaintiff characterizes the contract as one for services, or, in the alternative, a mixed contract for goods and services, and thus argues that a six-year statute of limitations applies pursuant to N.J.S.A. § 2A:14-1. Opp. at 28–30. Moreover, Plaintiff argues that the statute of limitations should be equitably tolled until 2010, when it discovered that Defendant breached the contract. *Id.* at 30. As Plaintiff initiated its action within six years of uncovering the breach, it argues that the action is timely filed. *Id.*

To determine the applicable statute of limitations, the Court must first analyze whether the contract is governed by the Uniform Commercial Code ("UCC") or the common law. The UCC, codified at N.J.S.A. § 12A:1-101 *et seq.*, applies to contracts for "goods," but not to contracts for services. *Quality Guaranteed Roofing, Inc. v. Hoffmann-La Roche, Inc.*, 694 A.2d 1077, 1078 (N.J. Super. Ct. App. Div. 1997). The UCC defines a good as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . . ." N.J.S.A. § 12A:2-105. Where a contract is mixed, covering both goods and services, the UCC will apply if the aspects of the contract pertaining to goods predominates over the aspects pertaining to services. *Conopco, Inc. v. McCreadie*, 826 F. Supp. 855, 867 (D.N.J. 1993).

Here, there is no genuine material dispute that the parties entered into a mixed contract of goods and services. *See, e.g.*, *Docteroff v. Barra Corp. of Am., Inc.*, 659 A.2d 948, 953 (N.J. Super. Ct. App. Div. 1995) (finding the existence of a mixed contract where contract covered roofing materials and repair services). On the one hand, the contract governs Defendant's purchase of a good, the traverse winding unit. *See generally* ECF No. 69-5 ("Honczarenko Cert.") Ex. B. On the other hand, the terms of the agreement also cover related services, including designing, building, painting, and testing the machine before delivery, as well as start-up assistance and training. *Id.* at 1, 8–9.

Upon reviewing the contract, the Court finds that the goods portion of the agreement predominates.[4] "To determine whether goods or services predominate, the court must look to the 'essence,' or purpose, of the contract." *Conopco, Inc.*, 826 F. Supp. at 867 (citations omitted). In assessing the purpose of the contract, a court may consider "the language and circumstances surrounding the contract, the relationship between the goods and services, the compensation structure and the intrinsic worth of the goods provided." *Integrity Material Handling Sys., Inc. v. Deluxe Corp.*, 722 A.2d 552, 555 (N.J. Super. Ct. App. Div. 1999) (citing *Quality Guaranteed Roofing, Inc.*, 694 A.2d at 1077); *see also Riachi v. Prometheus Group*, 822 F. App'x 138, 144 (3d Cir. 2020) (citation omitted).

Considering first the language of the contract, Plaintiff's quote to Defendant is titled "For a Complete Slitting/Traverse Winding Line," (Honczarenko Cert. Ex. B at 1), and similarly, the document outlining Plaintiff's terms and conditions is titled "Terms of Sale" (*id.* at 13). The quote also provides detailed descriptions of the machine's general functionalities and the capabilities of

---

[4] Both parties reference the quote and terms of sale as the operative contractual documents. *See generally* Mot., Opp. Thus, the Court relies on these documents in conducting its analysis.

its specific components. *Id.* at 1–6; *see also Conopco*, 826 F. Supp. at 868–69 (considering the language of a mixed contract). Thus, the language of the contract itself places a clear emphasis on the sale of the good.

Second, cost information contained in the contract suggests that Defendant was purchasing a good from Plaintiff, and that any enumerated service was incidental. Specifically, the quote provides cost estimates for each portion of the winding line, the sum of which equals the total contract price. *Id.* While the contract indicates that Plaintiff was obligated to provide some services such as repair work if necessary, these services were not quoted separately. *Id.* at 8–9, 13. Indeed, given that the estimated price for the physical components of the machine equals the total contract price, it appears that any included services were incidental. *Id.* at 10. Thus, in addition to the contract's language, this allocation of cost favors a finding that goods predominate the contract. *See Power Restoration Int'l Inc. v. PepsiCo, Inc.*, No. 12-cv-1922, 2015 WL 1208128, at *11 (E.D. Pa. May 17, 2015) (finding that goods predominated in a mixed contract where the cost of goods exceeded the cost of services).

To counter this argument, Plaintiff asserts that the payment schedule demonstrates that the contract's emphasis is on design and labor—constituting services—not the machine itself. Specifically, Plaintiff argues that "all but 15% of the purchase price was due prior to delivery of the actual machines, further underscoring that Plaintiff was hired to design and fabricate machinery—not sell goods." Opp. at 29 (citing Honczarenko Cert. Ex. B at 12). However, the quote indicates that neither design, nor labor, nor any other service, was factored into the contract as a stand-alone cost. And in any event, a contract that requires the design and construction of a good is not necessarily a services contract. *Propulsion Techs. Inc. v. Attwood Corp.*, 369 F.3d 896, 901 (5th Cir. 2004) ("The fact that a manufactured item is custom designed . . . is not dispositive—

manufactured goods are still 'goods.'"). Indeed, courts have found that contracts, like the one here, for custom-designed manufactured equipment which also provide for services like testing and training are goods contracts governed by the UCC. *See KSW Mech. Servs. v. Johnson Controls, Inc.*, 992 F. Supp. 2d 135, 141 (E.D.N.Y. 2014); *Machine-Outils Henri, Ltee v. Morey Machinery, Inc.*, No. 94-cv-880, 1996 WL 254863, at *6 (S.D.N.Y. May 14, 1996). Accordingly, the Court finds that goods predominate the contract at issue, and, as a result, the contract is subject to the four-year statute of limitations, pursuant to N.J.S.A § 12A:2-725.[5]

The Court must next determine when Plaintiff's breach of contract claim accrued. For contract claims governed by the UCC, "a cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." N.J.S.A § 12A:2-725(2); *see also S. Jersey Gas Co. v. Mueller Co., Ltd. et al.*, No. 09-cv-4194, 2010 WL 1742542, at *5 (D.N.J. Apr. 27, 2010). Here, Plaintiff alleges that Defendant breached the contract by using and disseminating Plaintiff's confidential information to build the second traverse winder unit. ECF No. 57 at ¶¶ 24–29. K&S completed its build of the winding line and delivered the machine to Defendant by November 30, 2008. Pl. SMF Reply at ¶ 121. Therefore, after resolving all inferences in the Plaintiff's favor, the breach of contract occurred, at the latest, in 2008, when K&S delivered the project to Defendant. *See Uni-System, LLC v. U.S. Tennis Ass'n, Inc. et al.*, 350 F. Supp. 3d 143, 182–83 (E.D.N.Y. 2018) (finding that a breach of a contract claim accrued upon defendant's

---

[5] The Court notes that, despite Plaintiff's contentions, *Quality Guaranteed*, 694 A.2d at 1077, is distinguishable. There, the court determined that a roofing contract was likely one for services because it was titled a "Construction Agreement," and while defendant purchased roofing materials as part of the agreement, the purpose of the contract was the installation of a new roof. *Id.* at 1079. By contrast, here, the title of the parties' agreement refers to the machinery as an item for sale, and the purpose of the contract was to provide Rolled Metal with a traverse winder unit. Thus, while design and related labor services may be linked with the finished good, those services "were merely incidental to the dominant purpose of the contract." *Id.*

improper disclosure of contested trade secrets). Thus, to comply with the applicable four-year statute of limitations, Plaintiff needed to file its action no later than 2012. However, as it waited to bring its contract claim until 2015, the claim falls outside the operative statute of limitations period and is untimely.

Moreover, there is no basis for equitable tolling here. In accordance with the plain language of N.J.S.A § 12A:2-725(2), which, as stated above, provides that a cause of action for breach of contract accrues "regardless of the aggrieved party's lack of knowledge of the breach," New Jersey courts do not toll the statute of limitations pursuant to the discovery rule for UCC contract claims.[6] *See Cnty. of Morris v. Fauver*, 707 A.2d 958, 972 (N.J. 1998); *see also Riachi*, 822 F. App'x at 144 (noting that the discovery rule does not apply to New Jersey UCC contract claims). Notwithstanding the inapplicability of the discovery rule for this claim, in certain circumstances, the statute of limitations for UCC governed contract suits may still be tolled on other equitable grounds. *See* N.J.S.A § 12A:2-725(4) (stating that § 12A:2-725(2) "does not alter the law on tolling of the statute of limitations"); *Block et al. v. Jaguar Land Rover N. Am., LLC*, No. 15-cv-5957, 2016 WL 3032682, at *4–*5 (D.N.J. May 26, 2016) (finding that notwithstanding the absence of the discovery rule in UCC cases, equitable tolling may apply); *see also MRL Development I, LLC v. Whitecap Inv. Corp. et al.*, 823 F.3d 195, 205–06 (3d Cir. 2016) (same).

---

[6] According to the discovery rule, "in an appropriate case, a cause of action will not accrue until the injured party discovers, or by exercise of reasonable diligence and intelligence should have discovered, facts which form the basis of a cause of action." *O'Keeffe v. Snyder*, 416 A.2d 862, 869 (N.J. 1980). Even if the discovery rule applied here, Plaintiff's claim would be untimely. Plaintiff argues it became aware of Defendant's breach in 2010. However, it waited until 2015 before commencing the action. ECF No. 1. Assuming the statute of limitations was tolled until 2010, when the breach was discovered, Plaintiff still filed its claim outside the applicable four-year period.

Under New Jersey law, equitable tolling is appropriate on grounds other than the discovery rule where the plaintiff has:  (1) "been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass"; (2) "where a plaintiff has in some extraordinary way been prevented from asserted his rights"; and (3) "where a plaintiff has timely asserted his rights mistakenly by either defective pleadings or in the wrong forum." *Binder v. Price Waterhouse & Co. L.L.P.*, 923 A.2d 293, 298 (N.J. Super. Ct. App. Div. 2007) (internal quotations and citations omitted); *D.J.S.-W by Stewart v. United States*, 962 F.3d 745, 750 (3d Cir. 2020). This doctrine "should be applied sparingly and only in the rare situation where it is demanded by sound legal principles as well as the interests of justice." *Freeman et al. v. New Jersey et al.*, 788 A.2d 867, 880 (N.J. Super. Ct. App. Div. 2002) (citation omitted). While Plaintiff argues that the statute of limitations should be equitably tolled, it offers this argument based on a misplaced application of the discovery rule. Opp. at 30. Plaintiff makes no argument, and the Court sees no evidence in the record, that Defendant interfered with the filing of this action, that Plaintiff has been prevented from asserting its rights, or that Plaintiff mistakenly asserted its rights in a different forum. Therefore, the statute of limitations is not tolled. *See Binder*, 923 A.2d at 298.

Accordingly, Defendant's motion for summary judgment is granted as to Plaintiff's breach of contract claim (Count 1).

### 2.    Breach of the Covenant of Good Faith and Fair Dealing

For similar reasons, summary judgment is granted as to Plaintiff's claim for breach of the covenant of good faith and fair dealing (Count 2). All contracts include the covenant of good faith and fair dealing. *Durr Mech. Constr., Inc. v. PSEG Fossil, LLC*, 516 F. Supp. 3d 407, 417 (D.N.J. 2021) (citing *Wade v. Kessler Inst.*, 798 A.2d 1251, 1259 (2002)). Because this covenant does not

exist separately from a contract, *Noye v. Hoffmann-La Roche, Inc.*, 570 A.2d 12, 14 (N.J. Super. Ct. App. Div. 1990) (citations omitted), claims for the implied covenant of good faith and fair dealing are subject to the same statute of limitations period as governs the associated breach of contract claim. *See Kartzman v. Arcola Sales & Servs. Corp. et al.*, No. 11-bk-29113, 2017 WL 65822, at *6–*8 (D.N.J. Jan. 5, 2017); *Stockroom, Inc. v. Dydacomp De. Corp.*, 941 F. Supp. 2d 537, 541 (D.N.J. 2013). Here, like its breach of contract claim, Plaintiff's covenant of good faith and fair dealing claim is subject to the four-year statute of limitations period applicable to UCC contracts. *Stockroom, Inc.*, 941 F. Supp. 2d at 541 (dismissing a claim for the covenant of good faith and fair dealing for being time barred pursuant to § 12A:2-725(2)); *see also Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 587 (N.J. 1997) (finding that the UCC governed a covenant of good faith and fair dealing claim associated with a UCC contract). Therefore, the cause of action is untimely, as it was filed in 2015, approximately three years after the limitations window closed in 2012.[7]

### 3.   Unjust Enrichment

Next, regarding Plaintiff's unjust enrichment claim (Count 3), the parties agree that a six-year statute of limitations period for quasi-contract claims applies. Opp. at 30, Reply at 15; *see also Kopin v. Orange Prods., Inc.* 688 A.2d 130, 140–41 (N.J. Super. Ct. App. Div. 1997) ((finding that a six-year statute of limitations period applies to unjust enrichment claims) (citing N.J.S.A. § 2A:14-1)). The parties dispute, however, when the statute of limitations for Plaintiff's unjust enrichment claim accrued, and thus dispute whether it is timely. Defendant argues that, as with Plaintiff's contract claims, the unjust enrichment claim accrued at the latest in November 2008

---

[7] For reasons similar to those discussed in conjunction with Plaintiff's breach of contract claim, *see supra* Part IV.A.1, the Court finds no reason to equitably toll the statute of limitations here. *See Binder*, 923 A.2d at 298; *D.J.S.-W by Stewart*, 962 F.3d at 750

when Defendant received its second six-strand traverse winder unit from K&S. Mot. at 33; Reply at 15. By contrast, Plaintiff asserts the claim did not accrue until it discovered the violation in 2010. Opp. at 30.

Federal courts applying New Jersey law have held that an unjust enrichment claim accrues at the last rendering of services. *See Swift v. Pandey et al.*, No. 13-cv-650, 2013 WL 6054853, at *4 (D.N.J. Nov. 13, 2013) (citing *Baer v. Chase et al.*, 392 F.3d 609, 622 (3d Cir. 2004)) ("[T]he discovery rule does not apply to quantum meruit cases . . . . Rather, courts employ a 'last rendition of services' test."); *Rubinsky v. Zayat*, No. 14-cv-1540, 2015 WL 3517629, at *3 (D.N.J. June 4, 2015) (citation omitted) (noting that "the discovery rule does not apply to unjust enrichment claims"). Here, Plaintiff's unjust enrichment claim is based upon the contention that Defendant provided K&S with Plaintiff's trade secrets so that K&S could build the second six-strand traverse winder unit. Opp. at 31–32. Resolving all inferences in Plaintiff's favor, the last possible date Plaintiff provided Defendant with any service was when its trade secrets were last used to construct the                        second                        set                        of winders—in 2008, when the winders were finished and delivered to Defendant. Thus, the action accrued, at the latest, in November 2008. Pl. SMF Reply ¶ 121. Therefore, to timely file its unjust enrichment claim, Plaintiff would have needed to bring it within six-years of November 2008, or by November 2014. Because Plaintiff did not bring the unjust enrichment claim until 2015, outside the statute of limitations period, it is time barred.[8]

---

[8] As discussed *supra* Part IV.A.1, a statute of limitations may be equitable tolled under certain circumstances. *Binder*, 923 A.2d at 298; *D.J.S.-W by Stewart*, 962 F.3d at 750. However, apart from arguing tolling is warranted pursuant to the discovery rule, Plaintiff advances no contention that equitable tolling applies to its unjust enrichment claim. Opp. at 30. Accordingly, the Court finds that the statute of limitations for Plaintiff's unjust enrichment claim is not tolled.

Accordingly, Defendant's motion for summary judgment is granted as to Plaintiff's unjust enrichment claim (Count 3).[9]

### 4.      Unfair Competition

Defendant's last statute of limitations argument concerns Plaintiff's claim for common law unfair competition (Count 4). Pursuant to N.J.S.A. § 2A:14-1, a six-year statute of limitations applies to unfair competition claims. *See Kelly v. Estate of Arnone ex. rel. Ahern*, No. 08-cv-6046, 2009 WL 2392108, at *7 (D.N.J. Aug. 3, 2009) (citing N.J.S.A. § 2A:14-1). To toll the statute of limitations for unfair competition claims covered by N.J.S.A § 2A:14-1, a party may avail itself of the discovery rule. *See The Palisades at Fort Lee Cond. Ass'n, Inc. v. 100 Old Palisades, LLC*, 169 A.3d 473, 481–82 (N.J. 2017). As noted above, the discovery rule stipulates that, "in an appropriate case, a cause of action will not accrue until the injured party discovers, or by exercise of reasonable diligence and intelligence should have discovered facts, which form the basis of a cause of action." *O'Keeffe*, 416 A.2d at 869. Stated otherwise, under the discovery rule, a cause of action will not accrue until the injured plaintiff "knows or has reason to know of" the violation that would support a cause of action. *Caravaggio v. D'Agostini*, 765 A.2d 182, 186 (N.J. 2001).

Here, Plaintiff asserts that it did not become aware that Defendant allegedly used confidential information to build its second six-strand traverse winder unit until 2010 when it saw the winders on Defendant's website. ECF No. 68-17 ("Honczarenko Dep.") at 178. Defendant does not dispute this is when Plaintiff discovered the possible violation (Def. SMF at ¶ 75), but nevertheless asserts that the appropriate accrual date is in 2008 (Mot. at 35). However, as the record

---

[9] Alternatively, Defendant also argues that Plaintiff cannot sustain its unjust enrichment claim because the facts supporting this claim are the same facts supporting Plaintiff's breach of contract claim. Mot. at 34–35. Because the Court has dismissed Counts 1 and 2 on statute of limitations grounds, it need not reach this argument.

provides no indication that Plaintiff knew or should have known that it had a possible cause of action before 2010, the discovery rule applies. *See Cooley v. Penguin Grp. (USA) Inc.*, 31 F. Supp. 3d 599, 611–612 (S.D.N.Y. 2014). After applying the discovery rule, the Court uses an accrual date in 2010 for Plaintiff's unfair competition claim. Because Plaintiff ultimately brought its unfair competition action within six-years of the date of accrual, pursuant to N.J.S.A. § 2A:14-1, the claim is timely. Thus, summary judgment is denied as to Count 4.

### B.      Standing

Defendant also argues that Talon, as a successor company to PMC and PRMC Inc., has no standing to assert a trade secret misappropriation claim. Mot. at 15–17. Specifically, Defendant contends that PMC and PRMC Inc., not Talon, own the operative trade secrets, and even if Talon did have such an interest, PMC and PRMC Inc. never transferred to Talon the right to sue for any infringement on the trade secrets while they were owned by PMC and PRMC Inc. *Id.* Plaintiff disputes Defendant's characterization, arguing that it received both an ownership interest in the relevant trade secrets and the right to sue for past infringement in a 2011 merger among Plaintiff, PMC, and PRMC Inc. Opp. at 7–9. In staking out these positions, the parties have created a genuine issue of material fact regarding what interests were ultimately transferred to Talon in 2011. *See Doe v. Abington Friends Sch. et al.*, 480 F.3d 252, 256 (3d Cir. 2007) (citations omitted) (finding summary judgment inappropriate when the parties "show where in the record there exists a genuine dispute over a material fact").

As an initial matter, the parties agree that PMC and PRMC Inc. were the two predecessor entities involved in building Defendant's first six-strand traverse winder unit. Pl. SMF at ¶¶ 28; Mot. 15–16; Opp. at 8. However, the parties dispute what happened to these companies after the winder unit was finished. According to Defendant, PMC and PRMC Inc. "ceased to exist" in 2007,

(Def. SMF at ¶¶ 9–10, 15) and in that same year, merged to form a new entity, Progressive-Ruesch Machine Co., LLC (PRMC LLC). Honczarenko Dep. at 222. Defendant then asserts that, in 2011, PRMC LLC changed corporate forms again, becoming Talon. Mot. at 16. Defendant points out that there is no evidence in the record demonstrating that PMC and PRMC Inc. transferred any interest regarding trade secrets or the right to sue to PRMC LLC in 2007, and further, there is no evidence that PRMC LLC transferred these assets to Talon in 2011. *Id.* Moreover, Defendant argues that PMC and PRMC Inc. could not have transferred assets directly to Talon because PMC and PRMC Inc. did not exist in 2011 when any merger with Talon occurred. *Id.*

By contrast, Plaintiff refutes that PMC and PRMC Inc. ceased to exist in 2007, by arguing instead that these entities only stopped their day-to-day operations and were never merged with PRMC LLC. Pl. SMF Reply ¶ 17. To support this position, Plaintiff points to two identical asset transfer agreements entered into by PMC and Talon and PRMC Inc. and Talon in 2011. Honczarenko Cert. Ex. A. at Ex. B, Ex. C. These agreements stipulate that PMC and PRMC Inc. transferred to Talon rights to, among other things, "trade secrets . . . , all goodwill of business and all similar items" 69-4. *Id.* Indeed, Plaintiff's former corporate attorney, who prepared these transfer agreements, certified that PMC and PRMC Inc. transferred to Talon these rights. *Id.* at 2–3.

As Plaintiff has offered corporate documents indicating that Talon received an interest to the relevant trade secrets in 2011 in contravention of Defendant's account, Plaintiff has created a material issue of fact as to whether it has an ownership right to the trade secrets. *See Pflaumer Bros., Inc. v. Thordsen et al.*, No. 05-cv-6709, 2007 WL 2317377, at *9 (E.D. Pa. Aug. 8, 2007) (denying summary judgment where ownership of a trade secret is disputed). Moreover, these corporate documents create a material issue of fact as to whether Talon has the right to sue for

preexisting trade secret misappropriation. At the very least, the transfer agreement's provision for "all goodwill of business and all similar items" is ambiguous as to whether it includes the right to sue. *See Sköld v. Gladerma Labs., L.P.*, No. 14-cv-5280, 2016 WL 724755, at *5 (E.D. Pa. Feb. 24, 2016) (finding that the term "goodwill" in a contract could include a right to sue). Such a contractual ambiguity is for a jury to resolve. *See Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 421 (3d Cir. 2013) (quoting *Schor v. FMS Fin. Corp.*, 814 A.2d 1108, 1113–14 (N.J. Super. Ct. App. Div. 2002)). Accordingly, summary judgment as to Plaintiff's trade secret misappropriation claim (Count 6) on standing grounds is denied.[10]

### C.    Trade Secret Misappropriation

Assuming Talon has standing to assert its claims, Defendant argues that summary judgment as to Count 6 should still be granted because it did not misappropriate any trade secrets. "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain advantage." *Rohm & Haas Co. v. Adco Chem. Co.*, 689 F.2d 424, 431 (3d Cir. 1982) (internal citations omitted). To successfully bring a trade secret misappropriation claim under New Jersey law,[11] a plaintiff must establish that: "(1) a trade secret exists; (2) the information comprising the trade secret was communicated in confidence by plaintiff to the [defendant]; (3) the secret information was disclosed by [the defendant] and in breach of that confidence; (4) the secret information was acquired by a competitor with knowledge of [another's] breach of confidence; (5) the secret information was used by the competitor to the detriment of plaintiff; and (6) the plaintiff took precautions to

---

[10] The Court notes that Defendant makes a similar standing argument regarding Plaintiff's contractual claims. *See* Mot. at 14–15. However, because the Court dismissed these claims on other grounds (*see supra* Part IV.A.1–3), it need not address that standing argument here.

[11] Trade secret claims brought in federal court are governed by state law. *See Trading Partners Collab., LLC v. Kantor*, No. 09-cv-823, 2009 WL 1653130, at *8 (D.N.J. June 9, 2009).

maintain the secrecy of the trade secret." *Graco, Inc. v. PMC Global, Inc.*, No. 08-cv-1304, 2009 WL 904010, at *21 (D.N.J. Mar. 31, 2009) (quoting *Rycoline Prods., Inc. v. Walsh*, 756 A.2d 1047, 1052 (N.J. Super. Ct. App. Div. 2000)); *see also Rohm & Haas Co.*, 689 F.2d at 430. Here, Defendant argues that Plaintiff has not shown misappropriation occurred because it did not establish the elements of a misappropriation claim. However, the Court finds that a material dispute of fact exists as to whether a trade secret exists, and that there are also material disputes of fact regarding the remaining elements of Plaintiff's trade secret claim.

### 1.    Whether a Trade Secret Exists

In evaluating whether Plaintiff's misappropriation claim can survive summary judgment, the Court must first determine whether a trade secret exists (element one). *Merckle GmbH v. Johnson & Johnson*, 961 F. Supp. 721, 730 (D.N.J. 1997) (citations omitted). Defendant argues that no trade secret exists for three reasons: (1) Talon has failed to define a trade secret with specificity (Mot. at 18–22); (2) the traverse winding machine was of public knowledge in the industry and could be reverse engineered (*id.* at 22–25); and (3) any trade secret purportedly owned by Talon was valueless (*id.* at 27). The Court addresses each of these arguments in turn.

### i. Whether Talon Has Identified a Trade Secret

To demonstrate the existence of a trade secret, a plaintiff must define the trade secret with a "reasonable degree of precision and specificity . . . such that a reasonable jury could find that plaintiff established each . . . element of a trade secret" claim. *Syngy, Inc. v. ZA Assocs., Inc.*, No. 07-cv-3536, 2015 WL 899408, at *6 (E.D. Pa. Mar. 3, 2015) (quoting *Dow Chem. Canada Inc. v. HRD Corp.* 909 F. Supp. 2d 340, 346 (D. Del. 2012)); *Givaudan Fragrances Corp. v. Krivda*, No. 08-cv-4409, 2013 WL 5781183, at *4 (D.N.J. Oct. 25, 2013). A trade secret is defined with particularity when the trade secret can be distinctly separated from "matters of general knowledge

in the trade or [from] special knowledge of those persons who are skilled in the trade." *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 906 (3d Cir. 2021). Such particularity or specificity is required so that a defendant is placed on notice of what it has allegedly misappropriated. *Givaudan Fragrances Corp. v. Krivada*, 639 F. App'x 840, 845 (3d Cir. 2016).

The parties dispute whether Plaintiff defined its trade secrets with adequate particularity. In responses to written discovery requests, Plaintiff defined its trade secrets as the "winding lines as well as Plaintiff's proprietary [ACCU-WIND software]," which together represent a "fully integrated machine management system, incorporating functions and winding patterns into a closely supervised and controlled machine system." ECF No. 69-27 ("Conroy Cert."), Ex. LL at 8–9. As part of this machine system, Plaintiff also claimed its trade secrets include a "unique edge guide," the design and manufacturing of a "edger section," and particular formulas embedded in the ACCU-WIND software to create unique winding patterns. *Id.* at 9. Further, Plaintiff's expert, Dr. William Howard, identified and defined Plaintiff's trade secrets as the "design of the traverse winder line, including the mechanical, electrical and software design," as well as mechanical drawings, hydraulic and electric schematics, and software code. ECF No. 68-10 ("Howard Cert. Ex. 1") at ¶ 105; *see also id.* at ¶¶ 116–131 (discussing specific drawings and schematics).

Defendant contends that Plaintiff has failed to identify its trade secrets with the requisite specificity to sustain its misappropriation claim. Mot. at 20–21. However, this contention is unavailing. Plaintiff has explained that its trade secrets are an "integrated machine management system," encompassing "both the design of the winding lines" and Plaintiff's proprietary software. Conroy Cert., Ex. LL at 8. It further specified that the design of the machinery and software include particular winding patterns and edge designs. *Id.* at 9. Consistent with Plaintiff's explanation, Dr. Howard identified specific drawings, schematics, and portions of the software's code as

representative of the trade secrets claimed by Plaintiff's definition in its interrogatory responses (Howard Cert. Ex. 1 ¶¶ 116–131), and further asserted that Plaintiff's definition reflects an adequate description of a trade secret (*id.* at ¶ 107). Indeed, when asked during his deposition about any apparent discrepancy between Plaintiff's and his definition, Dr. Howard asserted that he identified a "subset" of the trade secrets identified by Plaintiff in its interrogatories so that he could more easily "talk about the individual pieces of the engineer[ing] and design." ECF No. 68-29 ("Howard Dep.") at 221–225. Where, as here, a plaintiff provides a general description and offers specific examples of protectable elements of the general design, courts have found a plaintiff has adequately defined a trade secret. *See Elmagin Capital, LLC v. Chen*, No. 20-cv-2576, 2021 WL 3629092, at *4 (E.D. Pa. Aug. 17, 2021) (finding that a description of trade secrets with additional exhibits can sufficiently define a trade secret); *IDT Corp. v. Unlimited Recharge*, *Inc.*, No. 11-cv-4992, 2012 WL 4050298, at *6 (D.N.J. Sept. 13, 2012) (finding that a combination of components described generally can constitute a trade secret). Accordingly, as Plaintiff has identified its trade secrets to encompass a specific integrated machine and software system—defined as the six-strand traverse winder unit and the attendant ACCU-WIND software—made up of various proprietary mechanical and software designs, including particular edger designs[12] and winding patterns, Plaintiff has adequately defined its trade secrets to survive summary judgment.[13] *See Syngy, Inc.*,

---

[12] To the extent that Defendant argues that Plaintiff has insufficiently defined its trade secret because not all mechanical trade secrets enumerated in Plaintiff's definition were included in Defendant's second winder unit (Mot. at 20), this argument raises further issues of fact.

[13] Defendant's reliance on *Givaudan*, 2013 WL 5781183, to argue that Plaintiff failed to define its trade secrets with the requisite specificity is unpersuasive. There, the trade secrets at issue were ingredient formulas to create various fragrances. The court determined that plaintiff failed to sufficiently define its trade secrets because it not only failed to provide defendants with the formulas of the specific fragrances plaintiff alleged were misappropriated, but it also failed to provide defendants with any other information to reasonably identify the fragrances at issue. *Id.* at *6–*7. Unlike in *Givaudan*, Plaintiff here has identified its trade secrets—its six-stand traverse

2015 WL 899408, at *6–*8 (E.D. Pa. Mar. 3, 2015) (finding that plaintiff sufficiently described trade secrets where plaintiff identified general components of a design and software it alleged is protected).

### ii. Whether Talon's Machine System Is Well-Known in the Industry

Defendant also contends that Plaintiff has asserted no protectable trade secrets because a traverse winder is well-known in the industry and can be reverse engineered. Mot. at 22–25. A product that is "of public knowledge or general knowledge within the industry cannot be protected as [a] trade secret[]." *Suncoast Tours, Inc. v. Lambert Grp., Inc. et al.*, No. 98-cv-5627, 1999 WL 1034683, at *8 (D.N.J. Nov. 10, 1999) (citing *Apollo Techs. Corp. v. Centrosphere Indus. Corp.*, 805 F. Supp. 1157, 1198 (D.N.J. 1992)). Moreover, a product which has been "'reverse engineered,'—*i.e.*, garnered by beginning with the finished product and determining the process used to manufacture it—cannot be protected as [a] trade secret[]." *Hammock by Hammock v. Hoffmann-LaRoche, Inc.*, 662 A.2d 546, 560 (N.J. 1995); *see also SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1255 (3d Cir. 1985). In determining whether a product can be reversed engineered, a court should consider the difficulty of reproduction, the amount of time it takes to reproduce the product, and the cost of developing the product. *See Rycoline Prod., Inc.*, 756 A.2d at 1055.

To argue that Plaintiff's machine system is well-known in the industry, Defendant cites to Dr. Howard's deposition, during which he agreed that "traverse winders are well-known and well used." Mot. at 22 (quoting Howard Dep. at 26–27). Likewise, Defendant's expert, Kenneth Walker, stated during his deposition that the method of traverse winding employed by Plaintiff's machine system is "well-known in the industry." ECF No. 68-50 ("Walker Dep.") at 71–72.

---

winder unit and ACCU-WIND software—with enough specificity for Defendant to know what is alleged to have been appropriated. *See Givaudan*, 639 F. App'x at 845.

Further, Defendant notes that K&S employees, President Peter Korcusko and engineer Alan Skalaski, testified that their company had built traverse winders with software similar to ACCU-WIND before working with Defendant, and in general, such systems contained standard industry components. *See, e.g.*, ECF No. 68-42 ("Korcusko Dep.") at 25 (asserting K&S had previously made three or four traverse winders); ECF No. 68-58 ("Skalaski Dep.") at 41, 53–54, 74, 129 (testifying that the traverse winders are standard in the industry).

Plaintiff, however, refutes this characterization. While other companies in the industry may have proprietary winders and associated software, Plaintiff asserts its winder and software technologies are unique. Howard Dep. at 296 (explaining that, for example, "[a]n iPhone and Android both have the same capabilities, but I don't think there's anybody who's going to say that means that Android owns all of Apple's trade secrets"). Indeed, Plaintiff notes that these types of machines are custom-built, not based off standard templates. Korcusko Dep. at 26 (testifying that K&S did not reuse plans from its previous jobs when building Defendant's traverse winder), 49 ("Everything we build is custom."). And, Plaintiff has provided evidence indicating that its machine is not easily reverse engineered, if at all reproducible. *See* Howard Dep. at 180 (testifying it would take "thousands of hours . . . , and the right staff" to reverse engineer the machine); Honczarenko Cert. at ¶ 27 (asserting it has taken Plaintiff "tens-of-thousands of hours" to design the machine and its software).

Viewing the record in the light most favorable to the non-moving party, Plaintiff has asserted facts sufficient to place Defendant's contention that Plaintiff's machine system was well-known in the industry in material dispute. Although traverse winders and the software that helps them function are used in the industry, Plaintiff has put forth facts demonstrating that *its* winder

and software combination is unique and not easily replicated. *See Abington Friends School et al.*, 480 F.3d at 256. Accordingly, the Court does not grant summary judgment on this ground.

### iii. Whether Plaintiff's Trade Secrets Have Value

Defendant finally challenges the existence of Plaintiff's trade secrets by asserting that they have no value. Mot. at 27.  For a trade secret to exist, it must be "sufficiently valuable . . . to afford a potential economic advantage over others." *Commc'ns Workers of Am. v. McCormac*, 9 A.3d 1107, 1123 (N.J. Super. Ct. Law Div. 2008); *see also Austar Int'l Ltd. v. AustarPharma LLC*, 425 F. Supp. 3d 336, 355–56 (D.N.J. 2019) (noting that a trade secret should derive economic value). Defendant asserts that Honczarenko filed for personal bankruptcy in January 2010. Def. SMF at ¶¶ 10, 16, 106. Further, Defendant argues that the bankruptcy documents, which contain information about PMC and PRMC Inc., the two Plaintiff predecessor entities involved with building Defendant's first traverse winder unit, demonstrate that the operative trade secrets are valueless. Mot. at 27. Specifically, Defendant interpreted these documents to indicate that PRMC Inc. had a value of $0 (Honczarenko Dep. Ex. 11-1 at 11), and that both PMC and PRMC Inc. were closed by 2007 (Honczarenko Dep. Ex. 11-2 at 12). It follows, Defendant contends, that "neither entity could have owned anything of value (including any trade secret) as of 2011, when [PMC and PRMC Inc.] each purportedly transferred assets to Talon." Mot. at 27.

In opposition, Plaintiff asserts that this argument is a red herring—the value of Plaintiff's predecessor companies in 2010 provides no information as to their value, or the value of their trade secrets, when the purported misappropriation occurred around 2007. Opp. at 22–23. And in any event, Plaintiff disputes Defendant's interpretation of Honczarenko's bankruptcy filings. According to Plaintiff, these filings reflect not the true value of the companies or their dates of operation, but rather Honczarneko's personal investment in the companies.  Conroy Cert. Ex. B at

23 (Honczarenko testifying that the filing asks whether "[*Honczarenko*] had any interest in the business" and reflects "the time that [*he*] had ownership" in the company) (emphasis added).

Notwithstanding this dispute, Plaintiff offers additional evidence to suggest that the trade secrets—the purportedly misappropriated machine components and software—held value. In this regard, Honczarenko represented that if Defendant had purchased the additional six-strand winder unit or licensed the use of software and schematics from Plaintiff in 2007 instead of sourcing their machines from K&S, the trade secrets inherent to the winder system would have generated Plaintiff a "positive net value and [] cash flow from such an arrangement." Honczarenko Cert. ¶¶ 21–22. Indeed, Nicholas Cereste, President of K&S, testified that K&S offered to purchase one of Plaintiff's predecessor companies around 2007. ECF No. 68-8 ("Cereste Dep.")  at 132. And, at the time of his 2017 deposition, which occurred after Honczarenko's 2010 bankruptcy, Cereste testified that K&S continued to be interested in purchasing one of Plaintiff's predecessor companies, suggesting it, including the trade secrets it owned, retained some value. *Id*. at 143 ("[K&S] ha[s] full interest in buying Ruesch and we want to make a deal with them now to buy Ruesch . . . [K&S] could take that company and do something with it."). Thus, Plaintiff has offered facts sufficient for a reasonable jury to find that Plaintiff's trade secrets were valuable. As such, the Court does not grant summary judgment on this ground.

### 2.      Whether Plaintiff's Trade Secrets Were Confidential

Even if trade secrets exist, Defendant further argues that Plaintiff failed to communicate the alleged trade secrets to Defendant in confidence (element two), and that Plaintiff also failed to take measures necessary to protect the confidentiality of its trade secrets (element six). Mot. at 25–27. As stated above, to prevail on a trade secret misappropriation claim, a plaintiff must establish that "the information comprising the trade secret was communicated in confidence by plaintiff to

the [defendant]," and that the plaintiff "took precautions to maintain the secrecy of the trade secret." *Graco, Inc.* 2009 WL 904010, at *21 (citations omitted). Secrecy need not be absolute, but a plaintiff must take steps such that a "substantial element of secrecy . . . exists." *Merckle Gmbh*, 961 F. Supp. at 731 (D.N.J. 1997); *see also Sun Dial Corp. v. Rideout*, 108 A.2d 442, 445 (N.J. 1954). The test to determine whether a plaintiff took steps to maintain the confidentiality of the trade secret is one of reasonableness. *See Howmedia Osteonics Corp. v. Zimmer, Inc.*, No. 11-cv-1857, 2012 WL 5554543, at *9 (D.N.J. Nov. 14, 2012). As such, an inquiry into secrecy is a "quintessential question of fact." *Baxter Healthcare Corp. v. HW Speciality Pharma Corp.*, 157 F. Supp. 3d 407, 425 (D.N.J. 2016).

Here, Defendant argues that it was not asked to sign any non-disclosure or confidentiality agreements. Mot. at 25–26. Instead, Defendant asserts that, at best, Plaintiff included a "no copying" provision in its terms of service with Defendant and on drawings related to the machine system, but this clause does not include "the word 'confidential' nor any variant thereof." *Id.* at 26 (citing Hoczarenko Dep. at 331, 437; Honczarenko Dep. Exs. 13–15). Accordingly, Defendant asserts such a clause is insufficient to indicate Plaintiff considered documents it shared with Defendant confidential. *Id.* at 26–27. Moreover, Defendant claims that Plaintiff could not have intended or maintained confidentiality because Plaintiff encouraged Defendant to view one of its machines at a third-party's warehouse, and an article discussing this machine appeared publicly in a trade magazine. *Id.* at 26.

Plaintiff refutes Defendant's claims that it insufficiently protected the confidentiality of its trade secrets. While Defendant may not have signed an explicit non-disclosure agreement, the "no copying" clause in the terms of sale indicates that documents marked with that provision were provided in confidence, not to be disseminated, shared, or copied. Honczarenko Cert. Ex. B at 13

27

¶ 18 ("[P]urchaser agrees not to make drawings of the [item of sale] or any portions thereof, or permit others to do so, and will not duplicate or conspire in the duplication of the [item of sale]."). Moreover, Plaintiff's expert, Dr. Howard, found similar language stamped on Plaintiff's mechanical and hydraulic drawings related to the traverse winder project. Howard Cert. Ex. 1 at ¶ 56 (drawings are "not to be reproduced, copied, or otherwise disposed of, directly or indirectly and [are] not [to] be used in whole or in part to assist in making or to furnish any information for making drawings, prints, or parts thereof"). In addition to marking documents, Dr. Howard identified other measures Plaintiff took to maintain the confidentiality of its trade secrets. For example, Plaintiff's computer systems were password protected and accessible only by authorized employees, Plaintiff disseminated documents marked for confidentiality protection only to parties who agreed to Plaintiff's terms, and Plaintiff did not share its software in a copyable or transferable format. Howard Dep. at 50–51; Howard Cert. Ex. 1 at ¶ 108. Finally, Plaintiff asserts that no trade secrets were visible by simply viewing the exterior of one of its machines. Honczarenko Cert. at ¶¶ 27–28.

Therefore, despite Defendant's contentions, the record indicates that Plaintiff took at least some steps to communicate in confidence and protect the secrecy of its trade secrets. Indeed, Mr. Walker, Defendant's expert, conceded that Plaintiff "did something" to maintain a level of secrecy. Walker Dep. At 175. Still in dispute, however, is whether the measures taken by Plaintiff to maintain confidentiality merits trade secret protection. *See Merckle Gmbh*, 961 F. Supp. at 731 (D.N.J. 1997) (finding a material dispute of fact where parties disagreed over the extent of the precautions taken by plaintiff to protect trade secrets). By putting this issue in dispute, Plaintiff has satisfied its burden to present evidence sufficient for a reasonable jury to conclude that its trade secrets were confidential and that it took steps to protect those trade secrets. *Syncsort Inc. v.*

*Innovative Routines Int'l, Inc.*, No. 04-3623, 2008 WL1925304, at *6 (D.N.J. Apr. 30, 2008). Therefore, there is a genuine dispute of material fact as the second and sixth elements of a trade secret misappropriation claim.

### 3.    Whether a Third-Party Used the Trade Secrets

Finally, to sustain its trade secret claim, Plaintiff must establish that "the secret information was disclosed by [the defendant]" (element three) and "was acquired by a competitor with knowledge of [another's] breach of confidence" (element four).[14] *Graco, Inc.*, 2009 WL 904010, at *21. The parties dispute whether Defendant disseminated trade secret information to K&S. Defendant argues that it did not provide K&S with, nor did K&S employees have access to, Plaintiff's blueprints or schematics while building the second six-strand traverse winder unit for Defendant. Mot. at 27–32; ECF No. 68-11 ("Delso Dep.") at 106; *see also* ECF No. 68-46 ("Reudys Dep.") at 40, 68–69; Skalski Dep. at 75–76. Defendant also asserts that K&S never received information regarding Plaintiff's ACCU-WIND program because subcontractors, EDC Electronics and Jim Delis, performed the electrical and software work on the machine. Mot. at 29–30. Cereste Dep. at 107–08, 136–37; Skalaski Dep. at 32.

Plaintiff, however, has presented evidence that suggests Defendant disseminated confidential information to K&S and that K&S then used that information to build the new traverse winder unit. Specifically, in conducting a software analysis of the machines built by K&S, Dr. Howard found that K&S "copied and pasted" portions of Plaintiff's ACCU-WIND code, and that

---

[14] As to element five regarding whether trade secrets were used to Plaintiff's detriment, Plaintiff asserts that had Defendant not allegedly misappropriated Plaintiff's trade secrets, and instead asked Plaintiff to complete the second winding unit, Plaintiff could have received revenue from building the additional machines. Opp. at 22 (citing Honczarenko Cert. at ¶ 21). Thus, to the extent Defendant argues that no trade secrets were used to the detriment of Plaintiff, the Court finds that there is a dispute of fact as to element five and summary judgment is denied.

digital screens integrated into the K&S machines displayed Plaintiff's logo.[15] Howard Cert. Ex. 1 at ¶¶ 94–104. Dr. Howard also found that "K&S drawings were directly copied from [Plaintiff], down to the typos, misspellings, and, in one case, the duplication of an identification number." ECF No. 69-16. Further, Plaintiff has provided emails from Tom Delso of Defendant (Rolled Metal) to Alan Skalaski of K&S, which purportedly included Plaintiff's hydraulic and mechanical drawings. Conroy Cert. Exs. D, E; *see also* Walker Dep. at 130–131.

 This evidence is sufficient to create a material dispute of fact regarding the third and fourth elements of Plaintiff's misappropriation claim. As the Court will not grant summary judgment on this ground or other grounds asserted by Defendant concerning misappropriation, as explained above, summary judgment regarding the trade misappropriation claim (Count 6) is denied.

## V.  <u>CONCLUSION</u>

 For the reasons stated above, the Court **GRANTS in part and DENIES in part** Defendant's motion for summary judgment. ECF No. 67. Summary judgment is granted in favor of Defendant on the following counts: breach of contract (Count 1), breach of the covenant of good faith and fair dealing (Count 2), unjust enrichment (Count 3), and violation of the New Jersey

---

[15] To the extent Defendant asserts it did not misappropriate any trade secrets in the ACCU-WIND software because it was unaware that Jim Delis had or would use Plaintiff's trade secrets in writing the code for the K&S winders, that argument is unavailing. Plaintiff has produced sufficient evidence for a jury to conclude that Defendant knew Delis was using Plaintiff's trade secrets in a purported breach of his confidentiality agreements with Plaintiff because of his close association with the parties involved and the duplicative nature of the machines/software. *Baxter Healthcare Corp*, 157 F. Supp. 3d at 426 (finding a defendant's knowledge that an employee was previously employed by plaintiff and involved with developing plaintiff's trade secrets sufficient evidence to create a material dispute of fact). In addition to Dr. Howard's findings regarding the copied code and Plaintiff's logo (Howard Cert. Ex. 1 at ¶¶ 94–104), Defendant agrees that Delis worked as Plaintiff's primary software developer, Delis had a type of NDA with Plaintiff, Delis worked for Plaintiff on Defendant's traverse winders, and that Delis worked with K&S on the second set of winders (PSOF reply ¶¶ 76–77, 79, 81). Thus, taking these facts together, Plaintiff has provided enough evidence to put this issue—that Defendant improperly acquired Plaintiff's trade secrets from Delis—into material dispute.

Trade Secrets Act (Count 5). Summary judgment is denied on the following counts, which may proceed:   unfair competition (Count 4) and trade secret misappropriation (Count 6).   An appropriate Order accompanies this Opinion.

**DATE**: August 30, 2022

s/ Claire C. Cecchi
_____
**CLAIRE C. CECCHI, U.S.D.J.**